**FILED**
**Aug 19, 2021**
**03:54 PM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT MEMPHIS

| | | |
|---|---|---|
| **THEODIS SCOTT,** | ) | **Docket No. 2020-08-0564** |
| **Employee,** | ) | |
| **v.** | ) | |
| **HOLLYWOOD FEED, LLC,** | ) | **State File No. 35536-2019** |
| **Employer,** | ) | |
| **And** | ) | |
| **NORGUARD NATIONAL INS. CO.,** | ) | **Judge Amber E. Luttrell** |
| **Carrier.** | ) | |

---

## COMPENSATION ORDER GRANTING BENEFITS

---

Mr. Scott seeks workers' compensation benefits for a back injury. Hollywood Feed, LLC provided authorized treatment for his injury but later denied the claim based on Mr. Scott's alleged misrepresentation of his preexisting condition at a physical. The issues include: 1) whether Mr. Scott's claim is barred based on misrepresentation; 2) if not, whether he suffered a permanent aggravation of his preexisting back condition, and 3) whether he is entitled to permanent total or permanent partial disability with additional benefits under Tennessee Code Annotated section 50-6-242, or increased benefits under section 50-6-207.

The Court holds Mr. Scott's claim is not barred by Hollywood's misrepresentation defense, and he sustained a permanent aggravation of his preexisting condition, which entitles him to permanent total disability benefits.

### Claim History

Mr. Scott, age sixty-three, is a high school graduate who worked as a truck driver for Hollywood Feed. On May 15, 2019, Mr. Scott felt a sharp pain in his low back while attempting to raise the landing gear on his truck. Hollywood Feed provided authorized treatment. By referral, Mr. Scott saw Dr. Douglas Cannon, a physical medicine and rehabilitation specialist.

One year earlier, Mr. Scott sought treatment for gradual low-back pain, which he attributed to driving his truck at work. Mr. Scott underwent an MRI in April 2018 and was

1

referred to Dr. Chiu Yuen To. Dr. To recommended a lumbar epidural steroid injection, which provided Mr. Scott relief. Mr. Scott testified Dr. To never recommended surgery, he missed no work and had no further back or leg pain between the May 2018 injection and his May 2019 injury. Mr. Scott stated he "felt great" until his work injury.

Between Mr. Scott's 2018 back treatment and his 2019 work injury, he saw Dr. Kallol Saha in July 2018 for a regular DOT physical. Dr. Saha noted no abnormal findings and certified Mr. Scott to continue driving.

*Treatment and Expert Proof*

After his 2019 work injury, Mr. Scott saw Dr. Cannon. He found decreased motion with pain down Mr. Scott's back and left leg, weakness on neurological exam, and reduced sensation in his leg. Mr. Scott also had a mildly positive seated straight leg raise test. Dr. Cannon wrote the findings suggested nerve root involvement. Dr. Cannon also reviewed an MRI performed in June 2019. He diagnosed an L5-S1 disc protrusion or herniation, stenosis with an L5 and S1 radiculopathy, and possible L4 radiculopathy. He recommended options including referral to a surgeon.

Mr. Scott declined the surgical referral based on his age, so Dr. Cannon treated him with epidural blocks and medication for nerve pain, and he placed work restrictions. After five months of treatment and continued symptoms, Mr. Scott still declined to see a surgeon; therefore, Dr. Cannon ordered a Functional Capacity Evaluation (FCE).

On February 7, 2020, Dr. Cannon reviewed the FCE results, which reported Mr. Scott provided a "full and consistent effort." Dr. Cannon used the FCE findings to place permanent restrictions of light to medium work with no lifting to shoulder height over twenty-one pounds, no overhead work over sixteen pounds, and no carrying with both arms over thirty-six pounds. He additionally completed a Physician's Certification Form stating Mr. Scott could not return to his pre-injury position as a truck driver because of his restrictions. Dr. Cannon also testified that Mr. Scott's past (non-truck driving) jobs were "physical jobs" and would be "very difficult for him." He explained it would not be medically advisable for Mr. Scott to return to his previous jobs because the prolonged standing, lifting, and positioning would be difficult for him.

Dr. Cannon placed Mr. Scott at maximum medical improvement on February 7 and noted he would need future medical treatment including medications, therapy, imaging, possible spine injections and/or surgery. He assigned a fifteen-percent permanent impairment rating.

Several months later, Mr. Scott returned to Dr. Cannon. On exam, he still had reduced motion, reduced sensation to light touch in the left L4 to S1 dermatomes, absent Achilles reflexes, and positive left seated straight leg raise test. Dr. Cannon stated the findings suggested he still had irritation of the nerve root consistent with L5-S1. Mr. Scott remained fearful of surgery, so Dr. Cannon refilled his nerve pain medication.

2

In his June 2021 deposition, Dr. Cannon testified that Mr. Scott had returned to see him "recently" with similar symptoms. He recalled that Mr. Scott said he now agreed it was time for a surgical opinion.

Dr. Cannon reviewed the 2018 medical records and MRI and testified that Mr. Scott sustained an aggravation of his preexisting back condition that arose primarily out of and in the course and scope of his employment. He further testified that Mr. Scott's "employment contributed more than fifty percent in causing his injury, considering all causes and that his injury contributed more than fifty percent in causing the . . . disablement, or need for medical treatment, considering all causes."

Dr. Cannon compared the pre- and post-injury MRIs and said he did not see a "significant difference." He explained that Mr. Scott's preexisting stenosis and "disc herniation that can touch his nerves" were aggravated by the work injury. Dr. Cannon stated, "[Mr. Scott] has underlying pathology. And so biomechanically, that makes him more at risk of an injury than someone with a healthy back." He said it would be speculative to say whether Mr. Scott would have needed or sought any further medical treatment for his lower back had the work injury not occurred.

Regarding Mr. Scott's nerve complaints, Dr. Cannon testified that nerve pain does not happen in a vacuum but is usually triggered by something. Mr. Scott's trigger was his work incident that "stressed that area of his spine that was biomechanically abnormal and predisposed him to have a problem with the nerve." When asked how, anatomically, the nerve becomes stressed, Dr. Cannon responded, "[Y]ou could get compression of the disc, which makes the disc herniation move a little bit and get the nerve. You can compress it. You can then get inflammation. You can get impedance of the local circulation. There's just different things like that that happen." He further testified that "[Mr. Scott's] had the nerve problem pretty much the whole time. That's been his complaint."

To challenge Dr. Cannon's impairment opinion, Hollywood sought a records review evaluation from Dr. David West. Hollywood introduced a C-32 Standard Form Medical Report where Dr. West assigned a five-percent permanent impairment. Based on the conflicting ratings, the parties requested an impairment evaluation through the Medical Impairment Rating Registry program. Mr. Scott saw Dr. John Lochemes for the evaluation.

Dr. Lochemes testified that he found verifiable radicular pathology based on his symptomatology, and motor and sensory exams. Dr. Lochemes diagnosed "lumbar spine intervertebral disc herniations at multiple levels with documented residual radiculopathy." Although he agreed with Dr. Cannon that Mr. Scott's MRI findings did not change, Dr. Lochemes explained that Mr. Scott's "nerves simply got worse" after his work injury. He assigned a twelve-percent permanent impairment.

Dr. David Strauser, Mr. Scott's vocational expert, testified at trial. He is a professor, who also works as a vocational consultant and career vocational counselor. Dr. Strauser

performed a diagnostic vocational interview of Mr. Scott, a review of his medical records, and a transferrable skills analysis.

Dr. Strauser considered Dr. Cannon's restrictions from the FCE, his testimony that prolonged standing, lifting, and positioning would not be medically advisable, and Mr. Scott's reported difficulties with prolonged sitting or standing. He testified that Mr. Scott's work history included commercial driving or manual labor jobs, which he stated were classified as low-skill or semi-skilled positions. Based on his work history over the last fifteen years, Dr. Strauser determined Mr. Scott's transferrable skills related to truck driving, but he is precluded from those jobs based on his permanent restrictions. He stated Mr. Scott is limited to light work but has no transferrable skills to perform a lighter job, such as a management position or desk work with computers. He further stated his age makes it harder to acquire new skills. Based on these factors, Dr. Strauser concluded Mr. Scott has no transferrable skills in the open labor market and is 100 percent vocationally impaired.

Hollywood objected to the admissibility of Dr. Strauser's opinion. Counsel argued that Dr. Strauser did not use a Wide Range Achievement Test, cite to the Dictionary of Occupational Titles, or use the Oasys job match software in his transferable skills analysis. The Court took the objection under advisement.

In response to Hollywood's objection, Dr. Strauser testified he followed the methodology of Michael Shahnasarian, PhD in his treatise on wage loss and disability analysis. He stated this book is the "gold standard" in performing vocational evaluations. Applying that method, he determined Mr. Scott's pre-injury earning capacity based on his age, education, and work experience. He stated the next step is to perform educational testing when necessary. He did not perform a wide range achievement test because it was unnecessary, since Mr. Scott had a "great work history" and is a high school graduate, so he assumed Mr. Scott is reading at a high school level. Dr. Strauser then considered Mr. Scott's developed skills from his education and work experience and considered his transferrable skills based on his residual functional capacity from his work restrictions and self-reported limitations.

Dr. Strauser explained why some of the traditional measures in his profession were not helpful. He said that Oasys is a software program that is merely a tool an evaluator can use, but it is outdated because it uses labor market data from 1992. Regarding the Dictionary of Occupational Titles, he stated it is likewise dated; therefore, he changed platforms and regularly uses an electronic format called Occupational Network Online (O-Net) to consider labor market information. He said he indirectly used it here. Dr. Strauser acknowledged he should have cited to Department of Labor market data in his report, but he stated it would not have changed his opinion because he uses it regularly to review the Memphis labor market.

*Lay Proof*

Mr. Scott testified he began working for Hollywood in February 2014 loading and unloading trucks and was later promoted to a full-time driver. Before Hollywood, he drove a concrete truck for twelve years. Besides commercial driving, he has worked as a machine operator in metal fabrication and operated a banding machine. He also was a utility worker assisting a crane operator. In his production position, Mr. Scott was promoted to supervisor and oversaw daily operations, but he still ran machines and equipment. He described his past positions as physical and sometimes heavy jobs that required a great deal of standing. He has never worked in an office or held a job working on a computer.

Hollywood could not accommodate Mr. Scott's restrictions, and the parties agreed he was constructively terminated in August 2019. He has not worked since. Mr. Scott testified he cannot work anymore and "wishes he could." He stated he has always worked until this injury and has now applied for Social Security Disability. He has considered surgery but is hesitant because of his age and the uncertainty that it will improve his condition.

After Mr. Scott's work injury and treatment, his left leg pain has never gone away. He is never pain free. He described pain extending down his buttock, thigh, and to the top of his left foot. It throbs constantly. He stated he cannot stand or sit for long periods of time. He sleeps with a pillow under his back, stopped doing activities, and rarely leaves the house. He takes medication daily to "make the pain bearable."

Mr. Scott explained the circumstances of his DOT physical to counter Hollywood's misrepresentation defense. Mr. Scott stated that when he filled out the intake form at Dr. Saha's office, he did not check that he had back problems because that was true at the time; he had not missed work and had no problems undergoing the physical exam. He also did not recall Dr. Saha asking him he if he had "any issues." He believed he accurately responded to Dr. Saha's questions. Mr. Scott maintained he never misrepresented any health issue when Hollywood hired him in 2014.

Emily Facello, Hollywood's Human Resources Director, testified to support Hollywood's misrepresentation defense. She said its drivers must maintain their CDLs, and she believed they were required to undergo DOT physicals every two years. On cross-examination, Ms. Facello agreed that Mr. Scott already had his CDL when he was hired in 2014; therefore, he was not required to undergo a physical at that time. Hollywood had no questions concerning any misrepresentation at the time Mr. Scott was hired.

**Findings of Fact and Conclusions of Law**

At a compensation hearing, Mr. Scott must prove by a preponderance of the evidence that he is entitled to the requested benefits. Tenn. Code Ann. § 50-6-239(c)(6) (2020).

*Misrepresentation Defense*

The Court first considers Hollywood's threshold argument that Mr. Scott's claim is barred based on his alleged willful misrepresentation of his 2018 back pain during his DOT physical. It cited *Federal Copper and Aluminum Company v. Dickey*, 493 S.W.2d 463, 464 (Tenn. 1973), where the Tennessee Supreme Court adopted the following test for willful misrepresentation:

> (1) The employee must have knowingly and willfully made a false representation as to his physical condition; (2) the employer must have relied upon the false representation and this reliance must have been a substantial factor in the *hiring*; and (3) there must have been a causal connection between the false representation and the injury.

*Id*. at 465 (Emphasis added).

Here, Hollywood acknowledged that Mr. Scott was already employed at the time of the alleged misrepresentation in 2018 and had worked for Hollywood since 2014. However, it argued the defense should nevertheless extend to this case, since passing a DOT physical was a requirement for Mr. Scott to maintain his CDL to continue driving for Hollywood. Mr. Scott countered that, as a matter of law, Hollywood's defense must fail because any alleged misrepresentation did not occur at the time of his hiring in 2014.

The Tennessee Supreme Court's adoption and application of the willful misrepresentation defense in *Dickey* was limited to the hiring context. Hollywood cited no Tennessee authority extending the defense to an alleged misrepresentation during a physical exam years after the hiring, and this Court declines to extend the application. Further, regarding the first *Dickey* factor, the Court finds Mr. Scott did not *knowingly* and *willfully* misrepresent his physical condition to Dr. Saha when he completed the questionnaire. Mr. Scott's uncontroverted testimony was that his back symptoms completely resolved after his injection, and he was having no back problems whatsoever at the time of his DOT physical. The Court accepts this testimony and finds his explanation credible that he believed he accurately represented his condition to Dr. Saha.

*Permanency*

Hollywood next argued that Mr. Scott did not prove he sustained a permanent aggravation entitling him to permanent disability benefits. Hollywood cited *Milligan v. Ten-State, Inc.,* No. 02 S01-9612-CV-00110, 1998 Tenn. LEXIS 69, at *5 (Tenn. Workers' Comp. Panel Feb. 20, 1998), where the Panel addressed whether an employee who alleged an aggravation of a preexisting condition was entitled to permanent disability benefits. The Panel held, "While an aggravation of a preexisting condition is compensable, in order to recover benefits for permanent disability based upon such aggravation, the aggravation must be permanent, and not the mere normal or expected progress of the preexisting condition." *Id.* at *4-5.

6

Under *Milligan* and other pre-Reform Act cases, Hollywood argued that Dr. Cannon did not testify to a permanent anatomic change, advancement, or aggravation of Mr. Scott's preexisting condition. It asserted the only time Dr. Cannon used the term "permanent" was regarding restrictions. Hollywood also pointed to Dr. Cannon's testimony that he did not see a "significant change" in Mr. Scott's pre- and post-injury MRIs.

Mr. Scott countered that a combination of the lay proof and Dr. Cannon's testimony, taken as a whole, proved that his work injury permanently aggravated his previously asymptomatic low-back condition and advanced the severity of his condition to the point that Dr. Cannon recommended a surgical referral on multiple visits.

The Court carefully analyzed the medical proof. Dr. Cannon stated he could not find a "significant change" between Mr. Scott's pre-injury and post-injury MRIs, which implies no anatomic change on the diagnostic studies. Also, Dr. Cannon did not use the term "permanent" when he testified regarding Mr. Scott's aggravation of his preexisting condition. Likewise, Dr. Cannon never testified that Mr. Scott sustained a *temporary* aggravation of his preexisting condition, nor did he testify that Mr. Scott ever returned to his pre-injury baseline after treatment for the work injury.

Mr. Scott's uncontroverted testimony was that he felt "great" the morning of May 15, 2019, with no symptoms in his back or leg. However, after the injury and multiple injections, he has never been pain- or symptom-free in his left leg, which was supported by Dr. Cannon's testimony. Throughout treatment, Dr. Cannon consistently noted an abnormal clinical exam suggesting irritation of a nerve root, and he recommended a surgical evaluation at multiple visits. At a return appointment after maximum medical improvement, Dr. Cannon again noted abnormal exam findings suggesting he still had irritation of the nerve root.

Dr. Cannon testified Mr. Scott's condition went from asymptomatic to symptomatic due to his work injury. He stated his nerve symptoms would be triggered anatomically by a compressed nerve. Dr. Cannon said, "[H]e's had the nerve problem pretty much the whole time. That's been his complaint." Because of his injury, Dr. Cannon also assigned permanent restrictions that precluded him from working as a truck driver and resulted in his termination. Moreover, Dr. Cannon, Dr. West, and Dr. Lochemes all assigned a permanent impairment rating for Mr. Scott's work injury. Even after being asked to apportion Mr. Scott's impairment rating between his preexisting condition and the work injury, each physician still testified that Mr. Scott suffered permanent impairment from the work injury.

Dr. Lochemes also testified that he found verifiable radicular pathology based on Mr. Scott's symptomatology, motor exam and sensory exam. Although he stated Mr. Scott's MRI findings did not change, Dr. Lochemes explained that his "nerves simply got worse" after his work injury.

7

In summary, no medical proof whatsoever suggested Mr. Scott's condition was "the mere normal or expected progress of the preexisting condition" under *Milligan* to support Hollywood's contention that he did not suffer a permanent aggravation. Thus, the Court holds the preponderance of the evidence showed Mr. Scott suffered a permanent aggravation of his preexisting back condition, and he is entitled to permanent disability benefits.

*Extent of Permanent Disability*

The extent of Mr. Scott's disability is a question of fact determined by consideration of all the evidence, both expert proof and lay testimony. *Duignan v. Stowers Mach. Corp.,* No. E2018-01120-SC-R3-WC, 2019 Tenn. LEXIS 224, at *22 (Tenn. Workers' Comp. Panel June 19, 2019). The relevant factors are Mr. Scott's skills, training, education, age, local job opportunities, and ability to work at available jobs in his post-injury condition. *Id.* He is entitled to an award of permanent total disability benefits if his injury "totally incapacitates [him] from working at an occupation that brings [him] an income."

Before analyzing the expert proof, the Court must rule on Hollywood's objection to the admissibility of Dr. Strauser's opinion under Tennessee Rules of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise. Among other requirements, Rule 703 requires a trial court to disallow testimony in the form of opinion or inference if the underlying facts or data indicate lack of trustworthiness.

*Ailshie v. TN Farm Bureau Fed'n,* 2019 TN Wrk. Comp. App. Bd. LEXIS 55, at *5-6 (Oct. 16, 2019). Hollywood further contended his opinion should be excluded under *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997), where the Tennessee Supreme Court stated that an "expert's opinions are [to be] based on relevant scientific methods, processes, and data." *Id.* The Court finds no merit in this argument.

Here, Dr. Strauser is well-qualified, and the underlying facts and data do not indicate a lack of trustworthiness. He explained he used the methodology from a highly regarded treatise on wage loss and disability analysis. Dr. Strauser detailed the specific steps he took in reaching his opinion, which included considering Mr. Scott's age, education, and work experience to establish his pre-injury earning capacity. He then explained why educational testing was unnecessary in this case, analyzed Mr. Scott's developed skills from his work history, evaluated his residual functional capacity based on his restrictions, and looked at his pre- and post-injury profiles to analyze his transferable skills in the labor market. Dr. Strauser also addressed the specific Oasys program and Dictionary of Occupational Titles he declined to use because they were outdated. The Court finds this satisfies Rule 702 and *McDaniel* and overrules the objection.

8

Considering the expert proof as a whole, Dr. Cannon restricted Mr. Scott to light to medium work with no lifting to shoulder height over twenty-one pounds, no overhead work over sixteen pounds, and no carrying with both arms over thirty-six pounds. He also completed a Physician's Certification Form stating Mr. Scott could not return to his pre-injury occupation as a truck driver−his occupation for over fifteen years−because of his restrictions.

As for his past production jobs, Dr. Cannon said those were "physical jobs" that would be "very difficult for him." He agreed it was not medically advisable for Mr. Scott to return to those jobs because of difficulty with prolonged standing, lifting and positioning.

For his part, Dr. Strauser considered the restrictions and testimony of Dr. Cannon, combined with Mr. Scott's reported difficulty with prolonged standing or sitting, his age, education, work history and transferrable skills. Dr. Strauser concluded he had no transferable job skills that he could physically perform and that he is 100 percent vocationally impaired. While Hollywood challenged Dr. Strauser's reliance on Mr. Scott's reported standing/sitting difficulty since they were not included in the FCE, the Court finds his reports were supported by Dr. Cannon. Further, Hollywood offered no competing vocational proof to challenge Dr. Strauser's opinions.

As to the lay evidence, Mr. Scott is sixty-three years old with a high school degree. He has worked the last fifteen years or more as a truck driver. Mr. Scott has "always worked" but cannot work anymore because of his injury. He has not worked anywhere since his termination and has applied for Social Security Disability.

Mr. Scott's uncontroverted testimony was that he has persistent nerve pain down his buttock, left leg, to his left foot that has never gone away since his injury. His leg throbs constantly, interferes with his sleep, and prevents him from standing or sitting for long periods of time. The Court observed Mr. Scott appeared uncomfortable sitting during the trial. He confirmed he was in pain, and the Court recessed more than once to allow Mr. Scott to stand or move around the courtroom.

Mr. Scott further testified he stopped doing activities and rarely leaves the house. He continues to rely on nerve pain medication daily and expressed his concern regarding surgery given his age and whether it would benefit him. The Supreme Court has consistently held that an employee's assessment as to his own physical condition is competent testimony that is not to be disregarded. *Limberakis v. Pro-Tech Sec., Inc.,* 2017 TN Wrk. Comp. App. Bd. LEXIS 53, at *5-6 (Sept. 12, 2017). The Court finds Mr. Scott credible. His testimony regarding his symptoms was supported by the medical proof. No physician noted any evidence of malingering, and the FCE suggested he gave a full and reliable effort. At trial, he was calm, forthcoming, self-assured, reasonable, and honest. *See Kelly v. Kelly,* 445 S.W.3d 685, 694-695 (Tenn. 2014) (discussing indicia of witness credibility.)

Therefore, the Court holds that Mr. Scott is permanently and totally disabled from gainful employment under Tennessee Code Annotated section 50-6-207(4)(B).

Alternatively, if Mr. Scott were not permanently totally disabled, the above findings would equally support an additional award of 260 weeks under Tennessee Code Annotated section 50-6-242(a) because this is an extraordinary case. The Court finds that, by clear and convincing evidence, it would be inequitable to limit Mr. Scott's recovery to only the benefits under section 50-6-207(3)(B). Further, the Court finds that as of the date of the award: (1) Mr. Scott has an impairment rating of at least ten percent to the body as a whole from Dr. Cannon, the authorized treating physician; (2) the authorized treating physician certified on a Bureau form that he no longer has the ability to perform his pre-injury occupation due to permanent restrictions from the work injury; and (3) he is earning less than seventy percent of the pre-injury average weekly wage or salary. *See generally* Tenn. Code Ann. § 50-6-242(a).

Hollywood argued that Dr. Cannon testified that up to nine percent of his fifteen percent rating could be apportioned to Mr. Scott's preexisting condition, which would result in a six-percent rating that would not meet the first requirement for additional benefits under 242(a). While Dr. Cannon gave conflicting testimony to each party's questioning regarding his rating, the Court finds he ultimately concluded that Mr. Scott would have a zero-percent impairment for his preexisting condition based on his lack of any symptoms before his work injury. Thus, the Court holds Dr. Cannon's rating of fifteen percent meets the requirement for an additional award.

*Calculation of Benefits*

Under section 207(4)(B), Mr. Scott is entitled to permanent total disability benefits. The parties agreed that because his injury occurred fewer than five years before the date when he is eligible for Old Age Social Security benefits, Mr. Scott's benefits are payable for a period of 260 weeks. *See* Tennessee Code Annotated section 50-6-207(4)(A)(i). At the stipulated weekly rate of $895.07, the benefits payable for the entire period of disability equal $232,718.20. The date Hollywood last paid temporary disability, February 7, 2020, is the starting date of Mr. Scott's permanent disability. The accrued benefits from February 7, 2020, through August 19, 2021, a period of 80 weeks, shall be paid to Mr. Scott in a lump sum of $71,605.60. However, Hollywood is entitled to a credit for a permanent disability advance of $7,544.16, which reduces the accrued benefits owed to $61,061.44.

The Court finds it appropriate to commute 100 weeks of the award to pay Mr. Scott's attorney's fees and litigation expenses. Tennessee Code Annotated section 50-6-207(4)(A)(ii)(a)-(b) allows 100 weeks of benefits to be commuted to a lump sum to pay fees and expenses. Section 50-6-229(a) allows commutation of attorney's fees if "approved and ordered by the trial judge." It is in Mr. Scott's best interest to prevent delay. Thus, the Court commutes 100 weeks of the award and orders Hollywood to pay it in a lump sum of $89,507 (100 weeks times $895.07).

As to the amount of the attorney's fee, Tennessee Code Annotated section 50-6-207(4)(a)(iii) provides that fees in PTD cases "shall be calculated upon the first four hundred and fifty (450) weeks of disability only." Further, an attorney's fee shall not exceed twenty percent of the award. In compliance with section 50-6-226(a)(2)(c), Mr. Scott's attorney filed a motion seeking a fee award and a declaration supporting it under Supreme Court Rule 8, RPC 1.5. Counsel has practiced law for twenty-two years, he expended extensive time and expense prosecuting this case, and he had a written contract for fees and expenses.

The Court finds these assertions support a twenty-percent fee. Specifically, the Court considers the factors in Tennessee Supreme Court Rule 8, RPC 1.5 The relevant factors here are the results obtained, the amount of work required, the customary fee set forth in a written agreement, and counsel's experience and reputation. Thus, of the 100-week commutation, counsel may take an attorney fee of $46,543.64 (260 weeks times twenty percent times $895.07). The balance of the 100-week commutation might be used for payment of counsel's expenses.

Hollywood's attorney's fees also exceeded $10,000. Counsel likewise submitted a motion and declaration, citing his approximately twelve years' practicing, his reputation and ability, and the substantial time expended. For the same reasons as employee's attorney, the Court finds employer's counsel's fees were appropriate and approves them.

*Recalculation of Payments*

Section 207(4)(ii)(c) requires that after the commuted lump sum is determined, the amount of the weekly permanent total disability payments shall be recalculated to distribute them in equal installments over the entire period of disability. Here, the remaining benefits after commutation equal $71,605.60 ($232,718.20 less the accrued benefits of $71,605.60 and the 100-week commutation of $89,507). Thus, the balance of $71,605.60 shall be payable from the date of the entry of the order, August 19, 2021, until Mr. Scott reaches eligibility for Old Age Social Security benefits, February 26, 2024, a total of 131 weeks and five days at the modified weekly rate of $543.66.

**IT IS THEREFORE ORDERED** as follows:

1. Hollywood Feed shall pay Mr. Scott permanent total disability benefits totaling $232,718.20 as follows: It shall pay accrued benefits in a lump sum of $71,605.60 less the permanent disability advance of $7,544.16, which reduces the accrued benefits owed to $61,061.44. Hollywood shall further pay 100 weeks of commuted benefits in a lump sum of $89,507 to pay for attorney's fees and expenses. The balance of $71,605.60 shall be paid periodically at the modified rate of $543.66 per week.

2. Hollywood Feed shall pay all reasonable and necessary future medical benefits under Tennessee Code Annotated section 50-6-204.

3. The Court approves the fees of both attorneys.

4. The Court taxes the $150.00 filing fee to Hollywood Feed, to be paid to the Court Clerk under Tennessee Compilation Rules and Regulations 0800-02-21-.06 (August, 2019) within five business days of this order becoming final, and for which execution might issue if necessary. Hollywood Feed shall file a Statistical Data Form (SD-2) with the Court Clerk within five business days of this order becoming final.

5. Unless appealed, this order shall become final thirty days after entry.

**ENTERED August 19, 2021.**

*Amber E. Luttrell*
**JUDGE AMBER E. LUTTRELL**
**Court of Workers' Compensation Claims**

**Appendix**

**Technical Record**
1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Request for Scheduling Hearing
4. Scheduling Order
5. Order Denying Summary Judgment
6. Joint Pre-Compensation Hearing Statement
7. Employee's Pre-Hearing Brief
8. Employer's Pre-Hearing Brief
9. Pre-Trial Order
10. Post-Discovery Dispute Certification Notice
11. Employer's Memorandum in Support of Summary Judgment
12. Employee's Memorandum in Opposition to Summary Judgment
13. Employee's Motion to Approve Attorney's Fees
14. Employer's Motion to Approve Attorney's Fees

**Exhibits**
1. Dr. Cannon's Deposition (with 5 exhibits)
2. Dr. David West's C-32
3. Dr. Kallol Saha's C-32
4. Dr. John Lochemes's Deposition
5. Hollywood Feed's Truck Driver Job Description
6. Mr. Scott's resume
7. Dr. David Strauser's Vocational Assessment Report
8. Dr. Strauser's CV

12

9. Dr. Strauser's report from another case (patient "Lorenzo")
10. Dr. Strauser's report from another case (patient "Benjamin")

## CERTIFICATE OF SERVICE

I certify that a copy of this Order was sent as indicated on August 19, 2021.

| Name | Email | Service sent to: |
|---|---|---|
| Billy Ryan, Employee's Attorney | X | billy@donatilaw.com<br>rebecca@donatilaw.com |
| Allen Callison, Employer's Attorney | X | Allen.callison@mgclaw.com |

*Penny Shrum*
**Penny Shrum, Court Clerk**
Court of Workers' Compensation Claims

13



<u>Compensation Hearing Order Right to Appeal</u>:

If you disagree with this Compensation Hearing Order, you may appeal to the Workers' Compensation Appeals Board or the Tennessee Supreme Court. To appeal to the Workers' Compensation Appeals Board, you must:

1. Complete the enclosed form entitled: "Notice of Appeal," and file the form with the Clerk of the Court of Workers' Compensation Claims *within thirty calendar days* of the date the compensation hearing order was filed. When filing the Notice of Appeal, you must serve a copy upon the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing of the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee. You must file the fullycompleted Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You bear the responsibility of ensuring a complete record on appeal. You may request from the court clerk the audio recording of the hearing for a $25.00 fee. A licensed court reporter must prepare a transcript and file it with the court clerk *within fifteen calendar days* of the filing the Notice of Appeal. Alternatively, you may file a statement of the evidence prepared jointly by both parties *within fifteen calendar days* of the filing of the Notice of Appeal. The statement of the evidence must convey a complete and accurate account of the hearing. The Workers' Compensation Judge must approve the statement of the evidence before the record is submitted to the Appeals Board. If the Appeals Board is called upon to review testimony or other proof concerning factual matters, the absence of a transcript or statement of the evidence can be a significant obstacle to meaningful appellate review.

4. After the Workers' Compensation Judge approves the record and the court clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties. The appealing party has *fifteen calendar days* after the date of that notice to submit a brief to the Appeals Board. *See the Practices and Procedures of the Workers' Compensation Appeals Board.*

**To appeal your case directly to the Tennessee Supreme Court, the Compensation Hearing Order must be final and you must comply with the Tennessee Rules of Appellate Procedure. If neither party timely files an appeal with the Appeals Board, the trial court's Order will become final by operation of law thirty calendar days after entry.** *See* **Tenn. Code Ann. § 50-6-239(c)(7).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



# NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation [www.tn.gov/workforce/injuries-at-work/](www.tn.gov/workforce/injuries-at-work/)

wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury:** _____

_____

**Employee**

v.

_____ **Employer**

Notice is given that _____ *[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date filestamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____    ☐ Motion Order filed on _____

☐ Compensation Order filed on_____    ☐ Other Order filed on_____ issued

by Judge _____.

## Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____
_____
_____
_____

## Parties

**Appellant(s)** (Requesting Party): _____ ☐Employer ☐Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

**Appellee(s)** (Opposing Party): _____  ☐Employer ☐Employee

Appellee's Address: _____  Phone: _____

Email: _____

Attorney's Name: _____  BPR#: _____

Attorney's Email: _____  Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### <u>CERTIFICATE OF SERVICE</u>

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.


_____

___ *[Signature of appellant or attorney for appellant]*



**Tennessee Bureau of Workers' Compensation**
**220 French Landing Drive, I-B**
**Nashville, TN 37243-1002**
**800-332-2667**

### AFFIDAVIT OF INDIGENCY

I, _____, having been duly sworn according to law, make oath that because of my poverty, I am unable to bear the costs of this appeal and request that the filing fee to appeal be waived. The following facts support my poverty.

1. Full Name:_____    2. Address: _____

3. Telephone Number: _____    4. Date of Birth: _____

5. Names and Ages of All Dependents:

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

6. I am employed by: _____

My employer's address is: _____

My employer's phone number is: _____

7. My present monthly household income, after federal income and social security taxes are deducted, is:

$ _____

8. I receive or expect to receive money from the following sources:

| | | | |
|---|---|---|---|
| AFDC | $ _____ per month | beginning _____ |
| SSI | $ _____ per month | beginning _____ |
| Retirement | $ _____ per month | beginning _____ |
| Disability | $ _____ per month | beginning _____ |
| Unemployment | $ _____ per month | beginning _____ |
| Worker's Comp. | $ _____ per month | beginning _____ |
| Other | $ _____ per month | beginning _____ |

LB-1108 (REV 11/15)                                                                                            RDA 11082

9. My expenses are:

Rent/House Payment $ _____ per month        Medical/Dental  $ _____ per month

Groceries        $ _____ per month        Telephone        $ _____ per month

Electricity      $ _____ per month        School Supplies $ _____ per month

Water            $ _____ per month        Clothing         $ _____ per month

Gas              $ _____ per month        Child Care       $ _____ per month

Transportation   $ _____ per month        Child Support    $ _____ per month

Car              $_____ per month

Other            $ _____ per month (describe: _____ )

10. Assets:

Automobile                $ _____        (FMV) _____

Checking/Savings Acct. $ _____

House                     $ _____        (FMV) _____

Other                     $ _____        Describe:_____

11. My debts are:

Amount Owed                          To Whom

_____                    _____

_____                    _____

_____                    _____

_____                    _____

**I hereby declare under the penalty of perjury that the foregoing answers are true, correct, and complete and that I am financially unable to pay the costs of this appeal.**

_____

APPELLANT

Sworn and subscribed before me, a notary public, this

_____ day of _____, 20_____.

_____

NOTARY PUBLIC

My Commission Expires:_____

LB-1108 (REV 11/15)                                    RDA 11082